ERIC J. HAMILTON (CA 296283)
ZACHARY B. POHLMAN*
Nebraska Department of Justice
2115 State Capitol
Lincoln, Nebraska 68509
Tel.: (402) 471-2683
Fax: (402) 471-3297
*Pro hac vice application forthcoming

Counsel for Plaintiff State of Nebraska

Additional counsel listed in signature block

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF NEBRASKA, STATE OF ALABAMA, ARIZONA STATE LEGISLATURE, STATE OF ARKANSAS, STATE OF GEORGIA, STATE OF IDAHO, STATE OF INDIANA, STATE OF IOWA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MISSOURI, STATE OF MONTANA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF UTAH, STATE OF WEST VIRGINIA, STATE OF WYOMING,** and **NEBRASKA TRUCKING ASSOCIATION**, a Nebraska corporation, <br><br> Plaintiffs, <br><br> v. <br><br> **STEVEN S. CLIFF**, in his official capacity as Executive Officer of the California Air Resources Board, and **ROBERT A. BONTA**, in his official capacity as Attorney General of California, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.  In a stunning gambit that both violates the Constitution and threatens our Nation's economic security, an agency of the State of California has attempted to override federal law and arrogate to itself the power to ban internal-combustion engines in medium- and heavy-duty vehicles. This attempted ban contravenes controlling law while defying real-world reality and burdening American families and businesses, already suffering from high inflation, with even more

costs. Today, internal-combustion technology powers more than 95 percent of medium- and heavy-duty vehicles. The alternative, battery-electric trucks, are unpopular among truck owners and operators. Battery-electric trucks are less efficient than current technology and create delays and additional costs that neither truckers nor end-consumers want to pay.

2.      California's regulation, which is called Advanced Clean Fleets, masquerades as a rule for in-state conduct. But by leveraging California's large population and access to international ports on the West Coast, Advanced Clean Fleets exports its "in-state" ban nationwide, creating harms which are certain to reach Plaintiffs' States. The regulation forces truckers in and out of California to retire their internal-combustion trucks if they want to come to California. This will inevitably disrupt the supply chain for all manner of goods, slow interstate transportation, raise prices on goods across the country, and impose costs on taxpayers and governments around the country. It is a misconceived and nationwide policy executed without the blessing of Congress or the consent of elected leaders in affected States.

3.      State Plaintiffs are 16 States and the Arizona State Legislature. State Plaintiffs' economies depend on the flow of goods and services across state lines. To facilitate interstate and international trade, the Constitution gives Congress the power "[t]o regulate commerce . . . among the several states." U.S. Const. art. I, § 8, cl. 3. In creating that grant, the Founders recognized that certain categories of conduct are best regulated through nationwide rules. The Commerce Clause implies the converse as well: A patchwork of state-by-state regulations on some subjects would subvert the States' common interest and must be prohibited.

4.      Congress exercised its Commerce Clause power in enacting the Clean Air Act ("CAA") and the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), which legislated on motor carriers in addition to air carriers.

5.      The CAA regulates certain sources' emission of pollutants into the air. The Act includes a common-sense rule that follows from the policy underlying Congress's power to regulate interstate commerce: Sources of emission that do not move can be regulated by the States within which they sit. But States generally cannot regulate sources of emission like motor vehicles that move. Because they may cross state lines, those sources' emissions must be governed by

nationwide restrictions set by Congress. Emissions standards that vary from one State to another would divide the States and counter the goal of promoting interstate trade that helped unite the States under one constitution.

6.      The FAAAA likewise promotes the States' interest in a uniform nationwide law governing articles of interstate commerce. Congress enacted the FAAAA after States frustrated interstate commerce by imposing regulations on motor carriers like trucks. The solution was a federal bar on state laws relating to the price, route, or service of motor carriers that transport property. Like the CAA, the FAAAA protected certain methods of cross-state transportation from regulations that could have impaired travel within the country.

7.      In addition to laws Congress enacts under the Commerce Clause, States are bound by that provision's negative implication, which at a minimum means States cannot burden instrumentalities of interstate commerce like trucks and trains. Nor can they impose protectionist measures that give in-state individuals and businesses an unfair advantage over out-of-state competitors.

8.      California, like State Plaintiffs, cannot ignore the Commerce Clause. That means it cannot bypass the CAA and the FAAAA nor impose rules that fall within the Commerce Clause's negative implication.

9.      But Defendants, California's chief law enforcement and environmental enforcement officers, have done just that through their implementation and enforcement of Advanced Clean Fleets. Advanced Clean Fleets forces certain owners and operators of trucks to retire their working internal-combustion trucks and replace them with battery-electric trucks that are less efficient, less affordable, and less available. Any covered truck fleet owner who refuses to comply is penalized with denial of access to California, the Nation's largest state economy and a hub for international trade. Advanced Clean Fleets also forces truck manufacturers to make fewer of the internal-combustion trucks that truck owners want to buy. Those businesses are also prohibited from doing business in California if they do not comply.

10.     Advanced Clean Fleets is barred by the Constitution, the CAA, and the FAAAA. And Defendants' enforcement of this unlawful rule has injured and will continue to injure Plaintiffs.

*Complaint for Declaratory Judgment and Injunctive Relief*                                    Page 3

Among other reasons, State Plaintiffs' economies require access to the California market. They rely heavily on the trucking industry to do so. But by burdening fleet companies with unpopular restrictions on the types of trucks that they may drive into California, Advanced Clean Fleets imposes significant barriers to interstate and international trade. The transition to preferred truck technology required by Advanced Clean Fleets also inflicts pocketbook harms on State Plaintiffs because battery-electric trucks cause more damage to highways than internal-combustion trucks, are not subject to fuel taxes, and are more expensive to purchase than internal-combustion trucks.

11.     Plaintiffs are entitled to declaratory and injunctive relief to redress their injuries and prevent Defendants' enforcement of the unconstitutional and statutorily forbidden Advanced Clean Fleets policies.

### THE PARTIES

#### Plaintiffs

12.     Plaintiff State of Nebraska is a sovereign State of the United States of America. Nebraska sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

13.     Michael T. Hilgers is the Attorney General of Nebraska. Attorney General Hilgers is authorized to bring legal actions on behalf of the State of Nebraska and its citizens.

14.     Plaintiff State of Alabama is a sovereign State of the United States of America. Alabama sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

15.     Steve Marshall is the Attorney General of Alabama. Attorney General Marshall is authorized to bring legal actions on behalf of the State of Alabama and its citizens.

16.     Plaintiff Arizona State Legislature is the elected legislative branch of the State of Arizona. The Arizona State Legislature sues to vindicate its sovereign, quasi-sovereign, and legislative interests.

17.     President Warren Petersen and Speaker Ben Toma are the elected presiding officers of the Arizona State Legislature.  President Petersen and Speaker Toma are authorized by chamber rules to bring legal actions on behalf of the Arizona Senate and the Arizona House of Representatives.

18.     Plaintiff State of Arkansas is a sovereign State of the United State of America.

Arkansas sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

19.     Tim Griffin is the Attorney General of Arkansas. Attorney General Griffin is authorized to bring legal actions on behalf of the State of Arkansas and its citizens.

20.     Plaintiff State of Georgia is a sovereign State of the United States of America. Georgia sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

21.     Christopher M. Carr is the Attorney General of Georgia. Attorney General Carr is authorized to bring legal actions on behalf of the State of Georgia and its citizens.

22.     Plaintiff State of Idaho is a sovereign State of the United States of America. Idaho sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

23.      Raúl R. Labrador is the Attorney General of Idaho. Attorney General Labrador is authorized to bring legal actions on behalf of the State of Idaho and its citizens.

24.     Plaintiff State of Indiana is a sovereign State of the United States of America. Indiana sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

25.     Theodore E. Rokita is the Attorney General of Indiana. Attorney General Rokita is authorized to bring legal actions on behalf of the State of Indiana and its citizens.

26.     Plaintiff State of Iowa is a sovereign State of the United States of America. Iowa sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

27.     Brenna Bird is the Attorney General of Iowa. Attorney General Bird is authorized to bring legal actions on behalf of the State of Iowa and its citizens.

28.     Plaintiff State of Kansas is a sovereign State of the United States of America. Kansas sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

29.     Kris Kobach is the Attorney General of Kansas. Attorney General Kobach is authorized to bring legal actions on behalf of the State of Kansas and its citizens.

30.     Plaintiff State of Louisiana is a sovereign State of the United States of America. Louisiana sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

31.     Elizabeth B. Murrill is the Attorney General of Louisiana. Attorney General Murrill is authorized to bring legal actions on behalf of the State of Louisiana and its citizens.

32.     Plaintiff State of Missouri is a sovereign State of the United States of America. Missouri sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

33.     Andrew Bailey is the Attorney General of Missouri. Attorney General Bailey is authorized to bring legal actions on behalf of the State of Missouri and its citizens.

34.     Plaintiff State of Montana is a sovereign State of the United States of America. Montana sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

35.     Austin Knudsen is the Attorney General of Montana. Attorney General Knudsen is authorized to bring legal actions on behalf of the State of Montana and its citizens.

36.     Plaintiff State of Oklahoma is a sovereign State of the United States of America. Oklahoma sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

37.     Gentner F. Drummond is the Attorney General of Oklahoma. Attorney General Drummond is authorized to bring legal actions on behalf of the State of Oklahoma and its citizens.

38.     Plaintiff State of South Carolina is a sovereign State of the United States of America. South Carolina sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

39.     Alan Wilson is the Attorney General of South Carolina. Attorney General Wilson is authorized to bring legal actions on behalf of the State of South Carolina and its citizens.

40.     Plaintiff State of Utah is a sovereign State of the United States of America. Utah sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

41.     Sean D. Reyes is the Attorney General of Utah. Attorney General Reyes is authorized to bring legal actions on behalf of the State of Utah and its citizens.

42.     Plaintiff State of West Virginia is a sovereign State of the United States of America. West Virginia sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

43.     Patrick Morrisey is the Attorney General of West Virginia. Attorney General Morrisey is authorized to bring legal actions on behalf of the State of West Virginia and its citizens.

44.     Plaintiff State of Wyoming is a sovereign State of the United States of America. Wyoming sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

45.     Bridget Hill is the Attorney General of Wyoming. Attorney General Hill is authorized to bring legal actions on behalf of the State of Wyoming and its citizens.

46.     Plaintiff Nebraska Trucking Association is an association devoted to advancing the interests of its motor carrier and allied members. These members provide transportation services in Nebraska, California, and across the country.

47.     Nebraska Trucking Association members include licensed motor carrier companies that manage, coordinate, and schedule the transportation of property throughout the United States, including in Nebraska, California, and the States that surround California. The Association's members include companies that are regulated by Advanced Clean Fleets. The Association's members also include companies that that have done business in California but will no longer do so because of Advanced Clean Fleets. Finally, the Association's members include one or more companies that presently do not do business in California, but despite a concrete and expressed desire to do so in the future, will now be unable to operate in California due to the burdens imposed by Advanced Clean Fleets.

**Defendants**

48.     Defendant Steven S. Cliff is the Executive Officer of the California Air Resources Board ("CARB"). Defendant Cliff is responsible, directly and through CARB, for the promulgation, implementation, and enforcement of Advanced Clean Fleets. Defendant Cliff is not a citizen of any of Plaintiffs' States. Defendant Cliff is sued in his official capacity only.

49.     Defendant Robert A. Bonta is the Attorney General of California. Defendant Bonta is responsible for the enforcement of Advanced Clean Fleets. Defendant Bonta is not a citizen of any of Plaintiffs' States. Defendant Bonta is sued in his official capacity only.

**JURISDICTION AND VENUE**

50.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) because this case presents a federal question arising under the Constitution and laws of the United States.

51.     Venue in this Court is proper under 28 U.S.C. § 1391(b) because both Defendants maintain an office and conduct their official business in the Eastern District of California.

52.     This Court has authority to grant the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and its inherent equitable powers.

1

**FACTUAL ALLEGATIONS**

2      53.    Under our Constitution, Congress sets policy for the Nation on interstate commerce,

3  and Congress's laws enacted on that subject trump inconsistent state laws. Acting under that

4  authority, Congress regulated the emission of pollutants in the CAA in 1970. At the same time, it

5  barred States from regulating emissions from mobile sources like vehicles. Two decades later in

6  1994, Congress next regulated motor carriers crossing state lines in the FAAAA. That law forbade

7  States from regulating the prices, routes, and services of motor carriers. Reinforcing those

8  principles, the dormant Commerce Clause recognizes that only Congress can regulate "the

9  instrumentalities of interstate transportation—trucks, trains, and the like." *Nat'l Pork Prod. Council*

10  *v. Ross*, 598 U.S. 356, 380 n.2 (2023).

11

**Executive Order N-79-20**

12      54.    Against this backdrop, California Governor Gavin Newsom signed Executive Order

13  N-79-20 on September 23, 2020. The Executive Order's main impetus was to force the

14  transportation sector to "decarbonize" and "transition away from fossil fuels." Executive Order N-

15  79-20, at 1, 4.

16      55.    To that end, the Executive Order exhorted various California governmental entities

17  to take unprecedented and drastic administrative actions that Governor Newsom deemed

18  "necessary to combat the climate crisis." *Id.* at 2.

19      56.    Governor Newsom's order singled out the trucking industry, setting several "goals"

20  specific to trucks. *Id.*

21      57.    In particular, the Executive Order stated that it "shall be a goal" of California that

22  "100 percent of in-state sales of new passenger cars and trucks will be zero-emission by 2035." *Id.*

23  Referring to trucks, the Order also mandated "that 100 percent of medium- and heavy-duty vehicles

24  in the State be zero-emission by 2045 for all operations where feasible and by 2035 for drayage

25  trucks."

26      58.    The Executive Order charged CARB with promulgating and enforcing regulations

27  to achieve its goals.

28

59.     CARB's first effort to implement the Executive Order arrived through a package of rules known as Advanced Clean Cars II (because it followed a pre–Executive Order N-79-20 passenger vehicle emissions regulation called Advanced Clean Cars).

60.     Among other things, Advanced Clean Cars II requires car manufacturers to sell more battery-electric and fewer internal-combustion light-duty passenger vehicles and by 2035 to sell no internal-combustion light-duty vehicles in California.

61.     CARB next promulgated a package of rules known as Advanced Clean Trucks.

62.     Among other things, Advanced Clean Trucks requires truck manufacturers to sell battery-electric trucks as an increasingly significant percentage of their annual California sales. These quotas thus forbid the sale of internal-combustion trucks in corresponding steps.

**Advanced Clean Fleets**

63.     CARB finalized its third and most-recent suite of electric-vehicle mandates under Executive Order N-79-20 on October 1, 2023. Named Advanced Clean Fleets, the regulation's first compliance deadlines took effect on January 1, 2024.

64.     Advanced Clean Fleets takes a significantly wider approach than its predecessors. While Advanced Clean Cars II and Advanced Clean Trucks target vehicle manufacturers, Advanced Clean Fleets is a comprehensive regulatory scheme that directly regulates not only truck manufacturers but also trucking fleet operators and owners.

65.     The rule applies broadly. Aspects of the rule apply to vehicles that "have a gross vehicle weight rating greater than 8,500 lbs., are light-duty package delivery vehicles, or are yard tractors." Cal. Code Regs., tit., 13, § 2015(a)(2). Thus, in addition to semi-trucks, medium-duty trucks, box trucks, vans, buses, yard tractors, and light-duty package delivery vehicles all fall within Advanced Clean Fleets' sweep.

66.     Advanced Clean Fleets is composed of four policies that together cover the sale and use of a significant share of medium- and heavy-duty vehicles in California: (1) a battery-electric truck mandate for high priority fleets, (2) an internal-combustion truck sales ban for truck manufacturers, (3) an accelerated battery-electric truck mandate for drayage trucks, and (4) special battery-electric truck requirements for state and local governments.

*High Priority Fleet Battery-Electric Truck Requirement*

67.     Advanced Clean Fleets directly regulates a substantial number of truck owners and operators in and out of California through its regulation of so-called "high priority" fleets.

68.     A high priority fleet is defined as any entity that owns or operates any number of trucks in California and (a) generates $50 million in total gross annual revenues or (b) owns or operates 50 or more vehicles in its fleet. Cal. Code Regs., tit., 13, § 2015(a).

69.     The policy applies to fleets that drive even just one truck in California in a year if the fleet meets the regulation's revenue or fleet quantity minimums.

70.     The crux of the high priority fleets regulation is the state-mandated retirement of internal-combustion trucks and replacement with battery-electric trucks.

71.     High priority fleets must choose between two onerous schedules that phase-in the transition to a 100 percent ban on internal-combustion trucks.

72.     Under the "Model Year Schedule," any vehicle added to a high priority fleet's California fleet (the subset of the total fleet that operates even one day in California) must be a battery-electric truck as of January 1, 2024. *Id.* § 2015.1(a). Beginning January 1, 2025, fleets on the Model Year Schedule plan must begin actively removing vehicles with internal-combustion engines from their California fleets when those vehicles reach certain mileage or age limits. *See id.* § 2015.1(b).

73.     Alternatively, under the "ZEV Milestones Option," high priority fleets face increasing internal-combustion truck retirement requirements every three years.

74.     Beginning January 1, 2025, the ZEV Milestones Option requires fleet owners to "continuously meet or exceed the ZEV Fleet Milestone percentage requirements" for California fleet vehicles as described in this table:

| Percentage of vehicles that must be ZEVs | 10% | 25% | 50% | 75% | 100% |
|---|---|---|---|---|---|
| Milestone Group 1: Box trucks, vans, buses with two axles, yard tractors, light-duty package delivery vehicles | 2025 | 2028 | 2031 | 2033 | 2035 and beyond |
| Milestone Group 2: Work trucks, day cab tractors, pickup trucks, buses with three axles | 2027 | 2030 | 2033 | 2036 | 2039 and beyond |
| Milestone Group 3: Sleeper cab tractors and specialty vehicles | 2030 | 2033 | 2036 | 2039 | 2042 and beyond |

75.     In addition to internal-combustion truck retirement requirements, Advanced Clean Fleets imposes burdensome reporting and recordkeeping obligations on high priority fleets. Reporting and recordkeeping rules apply even if a fleet operates only one truck on one day in a year in California.

76.     Starting February 1, 2024, "fleet owners must annually submit a compliance report" that includes detailed information about their business and each vehicle used in California. *Id.* § 2015.4(b).

77.     Fleet owners must submit additional reports any time they add a truck to their California fleet, remove a truck from their California fleet, drive a "backup vehicle" more than is allowed by regulation, or receive an exemption or extension from their phase-in schedule. *Id.* § 2015.4(e).

78.     A fleet owner or operator who fails to comply with any of the regulation's requirements "may be subject to penalties" that are not specified. *Id.* § 2015.6(b).

*Internal-Combustion Truck Ban for Manufacturers*

79.     Advanced Clean Fleets also bars truck manufacturers from selling internal-combustion trucks in California. *Id.* § 2016(a).

80.     As explained, a separate set of regulations called Advanced Clean Trucks already requires truck manufacturers to sell increasing percentages of battery-electric trucks in California and to decrease their internal-combustion truck sales.

81.     Advanced Clean Fleets adds a complete ban on the production and delivery for sale of internal-combustion trucks that begins in 2036. *Id.* § 2016(c).

82.     Advanced Clean Fleets also requires truck manufacturers to report certain information about trucks produced and delivered for sale in California. *Id.* § 2016(e).

83.     Any truck manufacturer who fails to comply with any of these requirements "may be subject to penalties." *Id.* § 2016(g)(2).

*Drayage Truck Battery-Electric Requirement*

84.     Advanced Clean Fleets imposes special, heightened requirements for "drayage" trucks, which are heavy-duty trucks that transport cargo from seaports and intermodal railyards. *Id.* § 2014(b).

85.     As of December 31, 2023, Advanced Clean Fleets requires trucks to be registered in CARB's online reporting system before they may conduct drayage activities in California. *Id.* § 2014.1(a)(8).

86.     Advanced Clean Fleets also forbids the registration of new internal-combustion drayage trucks as of January 1, 2024. *Id.* § 2014.1(a)(1).  New trucks must be battery-electric to be used for drayage operations.

87.     In addition, internal-combustion drayage trucks are removed from the registry and cannot operate in California once they reach certain mileage or age limits. *Id.* § 2014(b).

88.     Regardless of use, all drayage trucks entering seaports and intermodal railyards must be battery-electric by 2035. *Id.* § 2014.1(a)(2).

89.     Like other regulated entities, owners and operators of drayage trucks must report and keep on file for audit detailed information about their drayage trucks. *Id.* § 2014.1(a)(5), (6).

90.     Any drayage operator or owner who fails to comply with any of these requirements "may be subject to penalties." *Id.* § 2014.3(a).

*State and Local Government Battery-Electric Truck Requirement*

91.    Finally, Advanced Clean Fleets regulates state and local government agencies in California.

92.    As of 2024, battery-electric vehicles must account for at least 50 percent of new truck purchases and 100 percent by 2027. *Id.* § 2013(d)(1).

93.    Alternatively, California state and local agencies may elect to comply with the ZEV Milestones Option that applies to high priority fleets. *Id.* § 2013(e).

94.    California state and local agencies that fail to comply with any of the regulation's requirements "may be subject to penalties." *Id.* § 2013.4(b).

**Nationwide Harmful Effects of Advanced Clean Fleets**

95.    Advanced Clean Fleets will have dramatic and deleterious effects that extend far beyond the California border and in particular disrupt the trucking and renewable fuels industries including members of the Nebraska Trucking Association.

96.    California is the largest State in the United States by population and has an annual gross domestic product of $3.89 trillion.[1] Many products made in California are placed in interstate commerce and sold in other States. Likewise, California imports goods from other States.

97.    California also serves as a hub for interstate and international trade. "[L]arge volumes of goods are both imported and exported internationally" through California's seaports, which "process about 40 percent of all containerized imports and 30 percent of all exports in the United States."[2]

98.    Goods make their way to and from California and its ports through various modes of transportation—including trucks.[3] Thus, many trucking fleets (including fleets operated by members of the Nebraska Trucking Association) are likely to drive at least one truck in California at least once per year and become directly regulated by Advanced Clean Fleets.

_____

[1] *The 7 Biggest Industries in California*, California.com (Jan. 19, 2024), https://perma.cc/Z247-FU92.
[2] *Overview of California's Ports*, Cal. Leg. Analyst's Office (Aug. 23, 2022), https://perma.cc/T83D-HFPC.
[3] *Id.*

99.    In addition to goods, people move to and—more frequently—out of California. To do so, they use interstate rental trucks. Last year, more people moved out of California than almost every other State as measured on a per-capita basis.[4] Arizona, Georgia, Idaho, Montana, Missouri, Oklahoma, South Carolina, and Utah are among the top States that Californians choose to relocate to.[5]

100.    Complying with Advanced Clean Fleets' high priority fleet rules will be particularly problematic and costly for companies like members of the Nebraska Trucking Association that own or operate trucks as well as consumers who are dependent on trucks to receive goods or services.

101.    As compared to internal-combustion vehicles, battery-electric vehicles are more expensive, creating an extra cost that will be passed onto consumers nationwide.

102.    At the same time, trucking will become less efficient. Battery-electric trucks take more time to recharge than internal-combustion trucks take to refuel. And charging stations are more difficult to find than gas stations. As battery-electric trucks are added to fleets, trucks driving in and out of California will need to take lengthier and more frequent stops and divert their routes.

103.    All of this explains the unpopularity of battery-electric trucks. The Nation's largest trucking association, which boasts over 37,000 industry members, is "strongly opposed" to battery-electric truck mandates, calling them a "supply chain nightmare."[6]

104.    Advanced Clean Fleets' significant costs will force some fleet companies out of business or out of the Nation's largest State, which will strain the supply chain across the United States.

**Advanced Clean Fleets Harms Plaintiffs**

105.    Advanced Clean Fleets harms State Plaintiffs' sovereign, quasi-sovereign, legislative, and proprietary interests.

---

[4] Suzanne Blake, *The Five States Americans Are Leaving*, Newsweek (Oct. 12, 2023), https://perma.cc/FC72-WZRU.
[5] *725,000 People Left California in 2020. Which States Did They Move To?*, USA Facts (May 22, 2023), https://perma.cc/5CVD-PSDE.
[6] *California's Dream Is Becoming America's Supply Chain Nightmare*, Am. Trucking Ass'n (June 12, 2023), https://perma.cc/4X4W-XVNJ.

*Harm to Tax Revenue*

106.   Advanced Clean Fleets will reduce State Plaintiffs' tax revenue.

107.   A State's projected loss of tax revenues due to a policy enacted by another State is legally cognizable injury in fact. *Wyoming v. Oklahoma*, 502 U.S. 437 (1992); *see also California v. Azar*, 911 F.3d 558, 571–72 (9th Cir. 2018); *City of Oakland v. Lynch*, 798 F.3d 1159, 1164 (9th Cir. 2015); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1198 (9th Cir. 2004).

108.   State Plaintiffs levy taxes on the sale of fuel used by internal-combustion trucks.

109.   For example, Idaho levies a 32-cent tax on each gallon of diesel, gasoline, and ethanol fuel sold but does not tax electricity that is purchased to recharge vehicles.

110.   Arizona levies an 18-cent tax on each gallon of diesel, gasoline, and ethanol fuel sold. Ariz. Rev. Stat. § 28-5606(A), (B). In Fiscal Year 2022, Arizona's motor vehicle and fuel taxes generated about $2.5 billion in revenue.[7] Arizona does not tax electricity that is purchased to recharge vehicles.

111.   Nebraska levies a 29.1-cent tax on each gallon of diesel, gasoline, and ethanol fuel sold. This tax generates more than $300 million in Nebraska fuel tax revenue annually. At present, it does not tax electricity that is purchased to recharge vehicles.

112.   Because Advanced Clean Fleets requires truck fleet owners to retire internal-combustion trucks and replace them with battery-electric trucks, the fuel tax revenues that State Plaintiffs generate will fall as a direct consequence of Advanced Clean Fleets. Loss of revenue affects States in many ways. It requires programs that are funded by fuel taxes to offset those losses with decreased expenditures. It also affects budgets adopted by state legislatures. Loss of tax revenue requires state legislatures to cut spending or raise taxes to offset losses in fuel tax revenue. These acts result in a diversion of legislative resources.

113.   State Plaintiffs will suffer these revenue losses because internal-combustion trucks presently travel between each of Plaintiffs' States and California. These trucks refuel in Plaintiffs' States and pay fuel taxes when they do so.

---

[7] Arizona, *Annual Comprehensive Financial Report for the Fiscal Year Ended June 30, 2022*, at 26 (2023), https://perma.cc/Y6UT-56X8.

114.    State Plaintiffs are connected to California via the interstate system and other interstate roads.

115.    Nebraska, Indiana, Iowa, Utah, and Wyoming, for example, are connected to California by Interstate 80.

116.    Interstate 80 spans the Nation from San Francisco to the New York City metro area. It stretches 2,901 miles.[8]

117.    Of the 11 States that Interstate 80 crosses, no State has more miles of Interstate 80 than Nebraska's 455 miles. Together, Nebraska, Indiana, Iowa, Utah, and Wyoming account for more than 1,500 miles of Interstate 80.[9]

118.    Generations of Americans have traveled Interstate 80's path. Interstate 80 was part of the original 1956 plan for the Interstate Highway System and completed 30 years later in 1986. The interstate approximates the route of the Lincoln Highway, which in 1913 became the first transcontinental highway in the country. Before the Lincoln Highway, pioneers followed much of the same route in traveling the Oregon Trail, Mormon Trail, and California Trail.

119.    Today, many internal-combustion trucks travel this route on Interstate 80 to facilitate interstate trade and the migration of Californians out of California. Because of Advanced Clean Fleets, fewer internal-combustion trucks and more battery-electric trucks will travel Interstate 80.

120.    Many internal-combustion trucks also travel between Plaintiffs' States and California along Interstates 5, 8, 10, 15, and 40.

121.    Arizona shares a lengthy border with California. And three interstates—Interstates 8, 10, and 40—cross the Arizona-California border. Internal-combustion trucks presently travel these interstates between Arizona and California, but fewer will do so because of Advanced Clean Fleets.

122.    Many internal-combustion trucks also travel between California and Arizona, Idaho,

---

[8] *FHWA Route Log and Finder List*, Fed. Highway Admin., https://perma.cc/5RV3-9CVS (last accessed May 8, 2024).

[9] *Id.*

Montana, and Utah along Interstate 15. Only about 150 miles separate Utah from California on Interstate 15 (including a stretch of highway that passes through Arizona).[10] California, Arizona, Idaho, Montana, and Utah together host all but 124 of Interstate 15's 1,433 miles.[11] Fewer internal-combustion trucks and more battery-electric trucks will travel along Interstate 15 in Plaintiffs' States because of Advanced Clean Fleets.

123.    The upshot is that Advanced Clean Fleets will cause fewer taxpaying internal-combustion trucks to travel through each of Plaintiff's States and increase the number of battery-electric trucks that do so.

124.    The increase in battery-electric trucks, and the concomitant decrease of diesel-, gasoline-, or ethanol-fueled trucks, will harm State Plaintiffs' "ability to collect [fuel] tax revenues, an action undertaken in [their] sovereign capacity" that constitutes a "direct injury." *Wyoming v. Oklahoma*, 502 U.S. 437, 451 (1992).

125.    The resulting Advanced Clean Fleets–caused decrease in fuel tax revenues will lower the States' total tax revenues, reducing resources available for programs funded by the fuel tax. Among other things, fuel tax revenues fund the building and maintenance of State Plaintiffs' roads and highway systems.

*Increased Overweight Truck Permits*

126.    Because battery-electric trucks are significantly heavier than internal-combustion trucks, an increase in battery-electric trucks on roads will increase the number of overweight-vehicle permits that State Plaintiffs issue.

127.    State Plaintiffs require vehicles that exceed certain weight and dimension specifications to receive an overweight or over-dimensional permit before operating within their borders. *E.g.*, Neb. Rev. Stat. § 60-6,298.

128.    In Nebraska, for example, to apply for an overweight or over-dimensional permit, the applicant uses the Nebraska Department of Transportation ("NDOT") online-permitting system to enter contact, vehicle, load, and route characteristics.

---

[10] *Id.*
[11] *Id.*

*Complaint for Declaratory Judgment and Injunctive Relief*                                    Page 17

129.    Some permits self-issue through Nebraska's automated system, but if the applicant's data triggers certain flags, then NDOT staff must review the permit request.

130.    The time that NDOT employees must spend and resources the State of Nebraska must expend to issue an overweight or over-dimensional permit varies by request.

131.    For flagged permit requests that require additional coordination by NDOT employees, the demand on NDOT employees' time varies as follows: (1) If the bridge structural review team is needed, add 10 working days; (2) if district management is needed, add 5 working days; (3) if a private route survey is needed, add 2 working days; (4) if a state patrol escort is needed, add 7 working days; and (5) if utility coordination is needed, add 10 working days.

132.    As explained, because of California's centrality to interstate and international trade, Advanced Clean Fleets will cause more battery-electric vehicles to drive in and through Plaintiffs' States.

133.    Given that battery-electric vehicles are generally heavier than internal-combustion vehicles, fleets covered by Advanced Clean Fleets will need to choose between (1) applying for an overweight-vehicle permit, or (2) decreasing the amount of cargo they carry to avoid the need to apply for a permit.

134.    At least some covered fleets will choose to obtain overweight-vehicle permits rather than reduce the amount of cargo they carry to stay under the maximum weight before an overweight-vehicle permit is needed.

135.    An increase in electric-vehicle traffic in Plaintiff States will therefore increase the number of overweight-vehicle permits that State Plaintiffs must issue on an annual basis.

136.    The increase in overweight-vehicle permits to be issued will cause State Plaintiffs' employees to spend more time working on issuing overweight permits.

137.    The increase in overweight-vehicle permits will also cause State Plaintiffs to spend more money as it issues more overweight permits.

*Harm to State Plaintiffs' Roads*

138.    State Plaintiffs construct and maintain interstates, highways, and other roads in their States—like Interstate 80. Many of these roads are built with pavement surfaces.

139. As explained, vehicles from within and outside Plaintiffs' States travel on State Plaintiffs' roads. Specifically, trucks with departures or destinations in California travel on State Plaintiffs' roads while transiting from or to California.

140. Pavement surfaces degrade over time based on the amount and weight of traffic, among other things. Heavier vehicles degrade pavement surfaces faster than lighter vehicles. And all other things equal, more frequent traffic degrades pavement surfaces faster than less frequent traffic.

141. Because of the damage that weight can cause to roads, bridges, and other structures, trucks are subject to weight limits.

142. All other things equal, battery-electric trucks are heavier than internal-combustion trucks.

143. Because of battery-electric trucks' increased weight, Advanced Clean Fleets will cause heavier vehicles to travel on State Plaintiffs' roads, accelerating the degrading of their roads.

144. Because of battery-electric trucks' increased weight, many battery-electric truck operators will reduce their payload to remain within weight limits. The payload that would have been carried on that truck had it been a lighter internal-combustion truck will instead be carried on a second truck. According to one estimate, for every 1,000 trucks currently on the road, an additional 343 trucks will be needed due to battery weight.[12] These additional trucks traveling on State Plaintiffs' roads because of Advanced Clean Fleets will also accelerate the degrading of their roads.

145. This accelerated damage to the roads in Plaintiffs' States will accelerate the repairs that State Plaintiffs must make to ensure their roads are in working order. It will also increase the appropriations that the Arizona State Legislature and other State Plaintiffs' legislatures must make.

*Increased Demand for Electricity*

146. Because battery-electric trucks must be recharged with electricity, Advanced Clean

---

[12] American Transportation Research Institute, *New ATRI Analysis Examines California's Electrification Readiness* (Dec. 18, 2023), https://perma.cc/SPP2-XSD8.

Fleets will cause State Plaintiffs to spend more money to provide enough electricity to meet the increased demand for electricity.

147.     The increased demand for electricity will also add stress to, and require additional investments in, the State Plaintiffs' electric grid.

*Harm to Proprietary Interests*

148.     Advanced Clean Fleets will harm all Plaintiffs' proprietary interests.

149.     State Plaintiffs own and purchase medium- and heavy-duty trucks.

150.     The Nebraska Trucking Association's members also own and purchase medium- and heavy-duty trucks.

151.     The State of Nebraska, for example, owns and purchases many twin-screw trucks. A twin-screw truck is a heavy-duty truck with two axles that both receive power from the engine.

152.     Because of Advanced Clean Fleets, truck manufacturers must increase the cost of internal-combustion trucks nationwide to offset the cost of complying with Advanced Clean Fleets' various policies and especially its ban on internal-combustion truck production and sales in California. *See* Cal. Code Regs., tit., 13, § 2016(c).

153.     Combined, Nebraska—and other Plaintiffs—will be harmed by Advanced Clean Fleets: they must either forego replacing their outdated medium- and heavy-duty trucks or spend more to purchase new medium- and heavy-duty trucks than they would have without Advanced Clean Fleets.

*Harm to Quasi-Sovereign Interests*

154.     Advanced Clean Fleets will harm "the health and well-being—both physical and economic—of [State Plaintiffs'] residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982).

155.     *First*, Advanced Clean Fleets threatens the economic well-being of State Plaintiffs' residents in general.

156.     Advanced Clean Fleets will disrupt three of State Plaintiffs' largest industries: trucking, farming, and biofuel production.

157.   Nebraska, for example, is home to many world-class logistics companies that employ thousands of residents across the State. Nebraska's trucking industry employs 1 in 12 Nebraskans, making it the State's third-largest industry.[13]

158.   "Truckers carry more than 82-percent of all the freight in Nebraska, and about half of the state's communities get everything they need only from a truck."[14]

159.   Advanced Clean Fleets will significantly increase compliance costs for trucking companies that deliver goods to citizens in Plaintiffs' States.

160.   The increased compliance costs will be passed down the supply chain and ultimately will be borne by consumers in the form of higher prices for food and other basic goods.

161.   In addition to the trucking industry, Advanced Clean Fleets will harm the farming and biofuels industries, as the regulation encourages a nationwide transition to electric-powered trucks and limits the potential of bio-fuel-powered trucks.

162.   Biodiesel is a clean-fuel alternative to diesel that is produced primarily from soybeans.

163.   Soybean farming is a major economic driver in Nebraska, where 350.9 million bushels of soybeans worth over $4.4 billion were harvested in 2021.[15]

164.   Nebraska is also the Nation's second largest ethanol producer and third largest corn producer. Nebraska's 25 ethanol plants consume over 750 million bushels of corn each year and employ over 1,300 Nebraskans.

165.   In the next decade, ethanol-powered heavy-duty trucks may become a viable alternative to electric- and hydrogen-powered trucks.

166.   And even now, some box trucks, vans, buses, and light-duty package delivery vehicles can run on gasoline-ethanol blends that contain up to 85 percent ethanol.

---

[13] *Nebraska Trucking Association*, https://perma.cc/LL42-W9EZ (last accessed Jan. 29, 2024).
[14] *Id.*
[15] *Biodiesel: Cleaner Fuel for Nebraska* (last visited Mar. 13, 2024), https://perma.cc/4PWT-U5TU.

167.   Yet neither biofuel-powered trucks nor ethanol-powered trucks qualify as "zero-emission vehicles" under Advanced Clean Fleets, thus restricting biofuels' future potential and limiting the pace at which State Plaintiffs' economies will grow.

168.   In other words, "increased reliance on electric vehicles has the potential to adversely impact the role of biofuels."[16]

169.   The adverse impact to biofuels that Advanced Clean Fleets will cause will harm State Plaintiffs because corn and soybean farming and biofuel production are major drivers of State Plaintiffs' economies.

170.   Given that the trucking, farming, and biofuel industries are major economic drivers for State Plaintiffs, the harm that Advanced Clean Fleets will cause those industries will harm the States' economies—and thus the economic well-being of all their citizens.

171.   *Second*, Advanced Clean Fleets also threatens the physical health and safety of all citizens of Plaintiffs' States who travel on roads with battery-electric trucks.

172.   As explained, battery-electric trucks are significantly heavier than internal-combustion trucks.

173.   Battery-electric trucks' heavier weight makes accidents involving them more likely to be severe and even deadly.

174.   A Biden Administration official recently warned regulators "about the increased risk of severe injury and death for all road users from heavier curb weights and increasing size, power, and performance of vehicles on our roads, including electric vehicles."[17]

175.   State Plaintiffs have a cognizable sovereign and quasi-sovereign interest in reducing the number of battery-electric trucks on their roads to protect their citizens from harm.

176.   In addition, to help mitigate the severity of accidents involving battery-electric vehicles, State Plaintiffs may need to install new, heavy-duty guardrails.[18]

---

[16] *2021 Annual State Energy Report* 27, Neb. Dep't of Env't & Energy (2021).
[17] Tom Krisher, *US Official Warns of Risks Posed by Heavy Electric Vehicles*, AP News (Jan. 11, 2023), https://perma.cc/RYC5-82VA.
[18] *See UNL Research Organization Conducts First-Of-Its-Kind Electric Vehicle Crash Test*, 10/11 Now (Jan 31, 2024), https://perma.cc/S7ZZ-F8JV.

*Harm to Nebraska Trucking Association*

177.    The Nebraska Trucking Association's members include companies that operate at least one truck in California each year and are directly regulated by Advanced Clean Fleets for that reason.

178.    These members expend resources in money and time to comply with Advanced Clean Fleets' reporting and recordkeeping requirements.

179.    These members will also be required to recompose their fleets to meet Advanced Clean Fleets' requirements. These members will, for example, be required to retire internal-combustion trucks and replace them with battery-electric trucks. Battery-electric trucks are inferior choices for the Association's members because they are more expensive than internal-combustion trucks. The Association's members also find it is more difficult to charge a battery-electric truck than it is to refuel an internal-combustion truck—both because there are far fewer charging stations than refueling stations and it takes considerable time to recharge a battery.

180.    Given how heavy battery electric trucks are, Advanced Clean Fleets forces Nebraska Trucking Association members to choose among carrying fewer goods, purchasing a greater number of trucks to carry the same amount of goods they can carry using internal-combustion trucks, *or* apply for overweight permits. Each option increases costs and decreases revenues.

181.    Other companies within the Association's membership will cease operations in California because of Advanced Clean Fleets. And another category of companies within the Association's membership will be deterred from expanding operations into California because of Advanced Clean Fleets.

## **LEGAL ALLEGATIONS**

182.    Advanced Clean Fleets is unlawful because it violates the Clean Air Act, the Federal Aviation Administration Authorization Act of 1994, and the U.S. Constitution's dormant Commerce Clause.

## **Clean Air Act § 209**

183.    The Clean Air Act amendments of 1970 enacted a comprehensive legislative scheme that regulates air emissions from both stationary and mobile sources.

184.    States retain the primary responsibility for regulating emissions from stationary sources, 42 U.S.C. § 7416, while the Clean Air Act gives the U.S. Environmental Protection Agency an exclusive authority to set nationwide emissions standards for mobile sources like "new motor vehicles" and the fuel they use. *Id.* §§ 7521, 7543(a); *see id.* § 5745.

185.    States are precluded from regulating emissions for motor vehicles because they move across state lines. Congress determined that national, uniform standards must apply to mobile sources, lest vehicle manufacturers and operators face 50 different regulatory regimes.

186.    Accordingly, Clean Air Act § 202 empowers the Administrator of the Environmental Protection Agency (EPA) to "prescribe . . . standards applicable to the emission of any air pollutant from . . . new motor vehicles or new motor vehicle engines which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a)(1).

187.    "Because greenhouse gases fit well within the Clean Air Act's capacious definition of 'air pollutant,' . . . EPA has the statutory authority to regulate the emission of such gases from new motor vehicles." *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007).

188.    To help achieve nationwide uniformity in emissions standards, Clean Air Act § 209(a) also makes it illegal for States to "adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles." 42 U.S.C. § 7543(a).

189.    Congress carved out a minor exception to this blanket preemption provision. The exception allows any State that had adopted motor vehicle emissions standards other than crankcase standards prior to March 30, 1966, to request a waiver of the preemption provision from the Administrator of the EPA. *Id.* § 7543(b).

190.    That exception applies to California alone because California is the only State that had adopted covered motor vehicle emissions standards by March 30, 1966. Richard K. Lattanzio, *Clean Air Act: A Summary of the Act and Its Major Requirements* 10, Cong. Rsch. Serv. (Sept. 13, 2022), https://crsreports.congress.gov/product/pdf/RL/RL30853.

191.    Congress allowed only California to seek a preemption waiver due "California's unique problems" regarding its air quality. *Motor & Equip. Mfrs. Ass'n, Inc. v. Env't Prot. Agency*, 627 F.2d 1095, 1109 (D.C. Cir. 1979) (quoting S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967)).

192.    Specifically, in the 1960s, California's location on the coast and weather caused it to face a state-specific problem with "smog," i.e., ground-level ozone. H.R. Rep. No. 90-728, at 22 (1967).

193.    The waiver provision thus permitted California to continue to enact emissions standards to regulate its "peculiar local conditions" like smog. *Id.* (quoting S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967)).

194.    The California emissions standards in effect at the time did that. In 1966, California enacted the country's first tailpipe emission standards to reduce criteria air pollutants with local effects, such as carbon monoxide and hydrocarbons.[19]

195.    But California's 1966 tailpipe emissions standards just set standards and did not prohibit any category of engine technology.

196.    The EPA has not issued and cannot issue a waiver for Advanced Clean Fleets.

197.    Section 209's California exception does not cover regulations like Advanced Clean Fleets that ban entire categories of engine technology and are aimed at reducing greenhouse gas emissions, rather than pollutants that create unique local conditions in California.

198.    EPA cannot issue a preemption waiver for the additional reason that any California waiver must be "consistent with" EPA's power to regulate emissions. *Id.* § 7543(b)(1)(C). And EPA has the power only to set "standards" for emissions—not to wholesale ban vehicles with internal-combustion engines from the roads. *Id.* § 7521(a)(1).

199.    At a minimum, EPA lacks "clear congressional authorization" under the Clean Air Act to ban internal-combustion vehicles from being manufactured or operated. The power to enact

---

[19] *The Federal Clean Air Act: California's Waivers—A Half-Century of Cooperative Federalism in Air Quality Management*, California Senate Committee on Environmental Quality 3 (Feb. 22, 2017) (Statement of Richard M. Frank), https://perma.cc/3DCG-CHSC.

such a ban or to allow California to enact such a ban is a major question reserved to Congress. *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723 (2022).

200.    Finally, EPA cannot issue a preemption waiver because § 209(b) violates the equal sovereignty that States are afforded under the Constitution. That statute unconstitutionally allows California—and only California—to enact regulatory measures unavailable to every other State. *See Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1485, 1497 (2019).

201.    Thus, Advanced Clean Fleets is and will remain preempted because each of Advanced Clean Fleets' four policies prescribes standards "relating to the control of emissions from new motor vehicles." 42 U.S.C. § 7543(a).

202.    The Supreme Court has held that regulations that "address the purchase of vehicles, rather than their manufacture or sale" are preempted by Clean Air Act § 209. *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 249 (2004).

203.    As explained, the high priority fleets program requires fleet owners to purchase and operate an increasing number of battery-electric trucks in their California fleet, and by 2042, fleets may not operate any internal-combustion trucks in California.

204.    The high priority fleets program is thus a standard "relating to the control of emissions from new motor vehicles." *Id.* § 7543(a).

205.    The truck manufacturers program, which requires truck manufacturers to sell an increasing number of battery-electric vehicles and no internal-combustion vehicles by 2036, is also a standard "relating to the control of emissions from new motor vehicles." 42 U.S.C. § 7543(a).

206.    Likewise, the drayage program, which requires newly registered drayage trucks to be electric, is a standard "relating to the control of emissions from new motor vehicles." *Id.* § 7543(a).

207.    And the state and local agency program, which prohibits California agencies from operating internal-combustion vehicles by 2035, is also a standard "relating to the control of emissions from new motor vehicles." *Id.* § 7543(a).

208.    Because each of Advanced Clean Fleets' sub-programs prescribes standards "relating to the control of emissions from new motor vehicles," *id.* § 7543(a), every aspect of Advanced Clean Fleets is preempted and unenforceable.

**Federal Aviation Administration Authorization Act of 1994**

209.    As with emissions regulations for vehicles, Congress recognized the importance of national uniformity in motor-carrier regulations.

210.    Against the backdrop of numerous state and federal regulations on the trucking industry, Congress first deregulated the motor-carrier industry in 1980. *See* Motor Carrier Act of 1980, 94 Stat. 793.

211.    Despite that effort, States continued to heavily regulate the trucking industry after 1980.

212.    Congress found that the States' regulation of the trucking industry "cause[d] significant inefficiencies," "increased costs," "curtail[ed] the expansion of markets," and "inhibit[ed] . . . innovation and technology." H.R. Conf. Rep. No. 103-677, at 87.

213.    To combat these inefficiencies, Congress determined that "preemption legislation [was] in the public interest as well as necessary to facilitate interstate commerce." *Id.*

214.    Congress thus enacted the Federal Aviation Administration Authorization Act of 1994. The law broadly preempted state regulation of the trucking industry, ensuring that "national and regional [motor] carriers attempting to conduct a standard way of doing business" are protected from "[t]he sheer diversity of [State] regulatory schemes." *Id.*

215.    The FAAAA provides that a State "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1).

216.    The preemption provision is phrased in the disjunctive. A state regulation that affects a price *or* route *or* service of any motor carrier is preempted and unenforceable.

217.    And, as the Supreme Court has recognized, it is enough if a state regulation merely "relate[s] to" motor carrier prices, routes, or services. 49 U.S.C. § 14501(c)(1).

218. The Court determined that the plain text of the FAAAA prohibits "'[s]tate enforcement actions *having a connection with, or reference to*,' [motor] carrier 'rates, routes, or services.'" *Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)). It has acknowledged that the statutory language "express[es] a broad pre-emptive purpose." *Morales*, 504 U.S. at 383.

219. The Court understood that the reason Congress used such broad preemptive language was that a "state regulatory patchwork" was "inconsistent with Congress' major legislative effort" to allow "the competitive marketplace" to shape the trucking industry, rather than individual States. *Id.* at 373.

220. The FAAAA preempts Advanced Clean Fleets because the regulation "relate[s] to" motor carrier prices, routes, and services.

221. *First*, Advanced Clean Fleets is "related to" motor carrier "price[s]." 49 U.S.C. § 14501(c)(1).

222. Battery-electric trucks are significantly more expensive than internal-combustion trucks. The cost of a new heavy-duty battery-electric truck is more than twice the cost of a new internal-combustion truck.[20]

223. In addition to increased capital costs, the costs of maintaining and recharging a battery-electric truck is substantially higher than maintaining and refueling a truck with an internal-combustion engine.[21]

224. Fleet owners and operators will not simply absorb these increased costs.

225. Instead, Advanced Clean Fleets will cause fleet owners and operators, including companies within the Nebraska Trucking Association's membership, to pass along to consumers the increased costs of operation by increasing their prices.

---

[20] Beia Spiller et al., *Medium- and Heavy-Duty Vehicle Electrification: Challenges, Policy Solutions, and Open Research Questions* at 8, Report 23-03, Resources for the Future (May 2023), https://perma.cc/7GCT-C7D4.

[21] *See* Chad Hunter et al., *Spatial and Temporal Analysis of the Total Cost of Ownership for Class 8 Tractors and Class 4 Parcel Delivery Trucks*, National Renewable Entergy Laboratory (Sept. 2021), https://perma.cc/6RFB-V4VQ.

226.   Advanced Clean Fleets thus has "a connection with" prices of motor carriers. *Rowe*, 552 U.S. at 370 (quoting *Morales*, 504 U.S. at 384).

227.   *Second*, Advanced Clean Fleets is "related to" motor carrier "route[s]." 49 U.S.C. § 14501(c)(1).

228.   Before Advanced Clean Fleets, trucks could travel into and around California regardless of engine technology and without registering with CARB. This includes travel on interstate highways like Interstates 5, 8, 10, 15, 40, and 80 that pass through Plaintiffs' States and are travelled by the Nebraska Trucking Association's members. But under Advanced Clean Fleets, certain fleet owners and operators are prohibited from driving their trucks on routes to and within California if they use too few battery-electric trucks or have not complied with CARB's registration and recordkeeping requirements.

229.   Advanced Clean Fleets also relates to motor carrier routes by forcing fleets to use less efficient trucks.

230.   Standard internal-combustion heavy-duty trucks with two 150-gallon tanks can travel up to 2,000 miles before refueling.[22] And gasoline- and diesel-refueling facilities are abundant.

231.   Conversely, battery-electric trucks can travel no more than 500 miles on a single charge.[23] And in many places, electric-charging stations capable of recharging a heavy-duty truck are virtually nonexistent.[24]

232.   Even if public and private investment in electric-vehicle charging stations increases in the next decade, electric-vehicle charging stations will be severely outnumbered by conventional fueling stations.

233.   Given the extreme lack of public charging stations capable of recharging battery-electric trucks, Advanced Clean Fleets will restrict fleet operators to routes that have sufficient

---

[22] Shreya Agrawal, *Fact Sheet | The Future of the Trucking Industry: Electric Semi-Trucks* (May 11, 2023), https://perma.cc/U7T5-C5AM.
[23] *Id.*
[24] *See id.* (noting there exists only 6700 public direct-current fast-charging stations in the United States, and of those, "most only serve passenger vehicles").

recharging facilities, forcing them to abandon routes that are currently and would remain well-travelled so long as the ability to refuel were not at risk.

234. Advanced Clean Fleets thus has "a connection with" routes of motor carriers. *Rowe*, 552 U.S. at 370 (quoting *Morales*, 504 U.S. at 384).

235. *Third*, Advanced Clean Fleets is "related to" motor carrier "services." 49 U.S.C. § 14501(c)(1).

236. Just as covered fleet owners and operators will be unable to travel on routes to and within California, the same fleet owners and operators, including companies within the Nebraska Trucking Association's membership, will be unable to offer services with departures or destinations in California.

237. Differences between internal-combustion and battery-electric technology will also affect motor vehicle services.

238. Battery-electric trucks need to be recharged more frequently than internal-combustion trucks need to be refueled, and recharging battery-electric trucks takes much longer than refueling trucks with internal-combustion engines.

239. These differences will make it impossible for fleet owners subject to Advanced Clean Fleets to offer the same services they could when using internal-combustion trucks.

240. For example, fleets operating battery-electric trucks will no longer be able to offer a time-sensitive shipper the option to transport a load 400 miles in eight hours. An internal-combustion truck could easily complete that delivery, but a battery-electric truck would have to stop once, if not twice, to recharge, with each stop taking much longer than a comparable stop to refuel with diesel or gasoline.

241. Advanced Clean Fleets thus has "a connection with" services of motor carriers. *Rowe*, 552 U.S. at 370 (quoting *Morales*, 504 U.S. at 384).

242. Advanced Clean Fleets is therefore preempted by the FAAAA and is unenforceable.

**Dormant Commerce Clause**

243. The Commerce Clause of the United States Constitution gives Congress the power "[t]o regulate Commerce among the several States." U.S. Const. art. I, § 8, cl. 3.

244.   This affirmative grant of power also supplies a "dormant" limitation on States' ability to affect interstate commerce. *Healy v. Beer Inst.*, 491 U.S. 324, 326 n.1 (1989).

245.   The dormant Commerce Clause prohibits States from enforcing two kinds of administrative rules: (1) rules that target the instrumentalities of interstate transportation and burden interstate commerce, and (2) rules that economically protect a State's citizens and industries from competition by citizens and industries of other States. Advanced Clean Fleets fails both tests.

246.   *First*, the dormant Commerce Clause precludes the enforcement of "certain state regulations on instrumentalities of interstate transportation—trucks, trains, and the like"—that burden interstate commerce. *Nat'l Pork Prod. Council v. Ross*, 598 U.S. 356, 380 n.2 (2023).

247.   When a "lack of national uniformity" on such instrumentalities "would impede the flow of interstate goods," "the Commerce Clause itself pre-empts [the] entire field from state regulation." *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 128 (1978).

248.   So, for example, Illinois could not require that trucks use a certain type of mudguard because the regulation "severely burden[ed] interstate commerce" for trucks wishing to drive through Illinois. *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 528 (1959).

249.   Nor could Arizona prescribe a maximum length of 70 cars for freight trains moving through the State due to the "serious impediment to the free flow of commerce" the regulation caused and the "practical necessity that such regulation, if any, must be prescribed by a single body having a nation-wide authority." *S. Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 775 (1945).

250.   Like the Illinois and Arizona regulations, Advanced Clean Fleets targets a paradigmatic instrumentality of interstate commerce: trucks.

251.   Like the Illinois and Arizona regulations, Advanced Clean Fleets is "out of line with the requirements of almost all the other States" and thus "place[s] a great burden of delay and inconvenience on those interstate motor carriers entering or crossing [California's] territory." *Bibb*, 359 U.S. at 529–30.

252.   Like the Illinois and Arizona regulations, the immense interstate burdens caused by Advanced Clean Fleets are not justified by any safety or environmental interests.

253.   Fleets that drive even one truck for even one day in California must comply with Advanced Clean Fleets' drastic vehicle-specification and reporting requirements.

254.   If a state requirement that trucks use certain mudflaps violates the dormant Commerce Clause, then CARB's attempt to regulate the very design of the truck's propulsion system must violate the doctrine as well.

255.   Like the Illinois and Arizona regulations, Advanced Clean Fleets violates the dormant Commerce Clause because it enacts an undue burden on the instrumentalities of interstate commerce.

256.   If Advanced Clean Fleets does not violate the dormant Commerce Clause, then Plaintiffs' States or any other State could prevent interstate trade by trucks by imposing similar regulations.

257.   Consider, for example, the result if Oregon, Nevada, and Arizona each imposed fleet regulations barring battery-electric trucks from entering their States.

258.   Combined with a California ban on internal-combustion trucks, the battery-electric vehicle bans of California's neighboring States would prevent all trucks from entering or leaving California.

259.   That would "invite a multiplication of preferential trade areas destructive of the very purpose of the Commerce Clause." *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 356 (1951).

260.   *Second*, Advanced Clean Fleets violates the dormant Commerce Clause because it is a protectionist regulation that benefits California-based trucking companies at the expense of trucking companies based in other States.

261.   Advanced Clean Fleets' vehicle-specification and reporting requirements are so burdensome that motor carriers with only limited activities in California will choose to forgo the California market altogether rather than comply with the regulations.

262.   California-based trucking companies with a substantial portion of their fleets operating in California, on the other hand, will have no choice but to comply with Advanced Clean Fleets.

263.   When out-of-state trucking companies refuse to do business in California, California-based trucking companies benefit.

264.   Advanced Clean Fleets thus guarantees that California-based trucking companies' share of the California goods-transportation market will increase at the expense of out-of-state trucking companies.

265.   Advanced Clean Fleets is a classic economic protectionist measure that the dormant Commerce Clause forbids. *See Ross*, 598 U.S. at 368–69.

## CLAIMS FOR RELIEF

### COUNT 1

### Preemption Under Clean Air Act § 209

266.   Plaintiffs incorporate the allegations in the preceding paragraphs of this Complaint.

267.   State laws that are expressly preempted by a federal statute may not be enforced under the Supremacy Clause. U.S. Const. art. VI, cl. 2.

268.   Clean Air Act § 209 does not allow States to "adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles." 42 U.S.C. § 7543(a).

269.   Advanced Clean Fleets adopts new standards relating to the control of emissions from new medium- and heavy-duty trucks—i.e., motor vehicles—for fleet purchasers, operators, owners, controllers, and manufacturers alike.

270.   The Supremacy Clause prohibits Defendants from enforcing Advanced Clean Fleets because it is expressly preempted by Clean Air Act § 209.

271.   Defendants are purporting to act within the scope of their authority under State law in implementing and enforcing Advanced Clean Fleets.

272.   Plaintiffs therefore seek prospective injunctive relief and declaratory relief under 28 U.S.C. § 2201.

### COUNT 2

### Preemption Under Federal Aviation Administration Authorization Act of 1994

273.   Plaintiffs incorporate the allegations in the preceding paragraphs of this Complaint.

274.    The Federal Aviation Administration Authorization Act of 1994 provides that a State "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier[,] any motor private carrier, broker, or freight forwarder . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1).

275.    Entities subject to Advanced Clean Fleets are motor carriers, motor private carriers, brokers, or freight forwarders because they provide motor vehicle transportation of goods or people. *See id.* § 13102.

276.    Those entities also transport property for many reasons including to facilitate interstate and international trade and to move property owned by individuals who wish to move into or (more frequently) out of California.

277.    Advanced Clean Fleets relates to the price of a motor carrier. It will cause motor carrier operators to charge increased "prices" to offset the significant increase in expenses they will incur due to the significantly increased purchase, maintenance, and charging costs of operating electric, as opposed to internal-combustion, vehicles.

278.    And motor carrier operators who fail to comply with any of Advanced Clean Fleets' stringent requirements face unspecified monetary "penalties," only deepening the financial burden the regulation imposes. Cal. Code Regs., tit., 13, § 2015.6(b).

279.    Advanced Clean Fleets relates to the routes of motor carriers. It prevents covered motor carriers from using their trucks in California unless those trucks comply with the regulation's draconian requirements.

280.    Even for trucks that comply, Advanced Clean Fleets will cause motor carriers to change their "routes" due to the significantly limited range of battery-electric trucks as compared to internal-combustion trucks as well as the virtually nonexistent availability of recharging facilities as compared to the prevalence of gasoline- and diesel-refueling facilities.

281.    Advanced Clean Fleets relates to the service of motor carriers. The regulation precludes covered motor carriers from providing service within California unless they comply with Advanced Clean Fleets.

282.    Even for motor carriers that comply with Advanced Clean Fleets, the regulation will cause motor carriers to restrict the "services" they provide because battery-electric trucks require more frequent and longer stops to recharge their batteries; thus, motor carriers will not be able to deliver property as quickly as they could using internal-combustion trucks.

283.    Advanced Clean Fleets is thus a "law related to a price, route, or service of any motor carrier." *Id.* § 14501(c)(1).

284.    Advanced Clean Fleets is therefore preempted by the FAAAA.

285.    The Supremacy Clause prohibits Defendants from enforcing Advanced Clean Fleets because it is expressly preempted by the FAAAA.

286.    Defendants are purporting to act within the scope of their authority under State law in enforcing and implementing Advanced Clean Fleets.

287.    Plaintiffs therefore seek prospective injunctive relief and declaratory relief under 28 U.S.C. § 2201.

## COUNT 3

## Violation of the Dormant Commerce Clause

288.    Plaintiffs incorporate the allegations in the preceding paragraphs of this Complaint.

289.    The Commerce Clause of the United States Constitution gives Congress the power "[t]o regulate Commerce among the several States." U.S. Const. art. I, § 8, cl. 3.

290.    This affirmative grant of power also supplies a "dormant" limitation on States' ability to affect interstate commerce. *Healy v. Beer Inst.*, 491 U.S. 324, 326, n.1 (1989).

291.    The dormant Commerce Clause prohibits State agencies from burdening the instrumentalities of interstate transportation and economically protecting its own citizens and industries from out-of-state competitors.

292.    Advanced Clean Fleets violates the dormant Commerce Clause in at least two ways.

293.    *First*, trucks are instrumentalities of interstate transportation, and Advanced Clean Fleets directly imposes strict purchase, production, and regulatory mandates on trucking operators and manufacturers, thus burdening interstate commerce.

294.     *Second*, the regulation is also a protectionist measure. It imposes burdensome costs on fleets that will be disproportionately burdensome for fleets with significant operations outside of California. Those restrictions give California fleet companies a greater slice of the overall interstate transportation market.

295.     Advanced Clean Fleets thus violates the dormant Commerce Clause.

296.     Defendants are purporting to act within the scope of their authority under State law in enforcing and implementing Advanced Clean Fleets.

297.     Plaintiffs therefore seek prospective injunctive relief and declaratory relief under 28 U.S.C. § 2201.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Declare that Advanced Clean Fleets is preempted by federal statutes, otherwise violates the United States Constitution, and is unenforceable, pursuant to 28 U.S.C. § 2201;

B.     Issue an injunction enjoining the Defendants from implementing or enforcing Advanced Clean Fleets;

C.     Award Plaintiffs the costs of the action and reasonable attorney's fees; and

D.     Award such other and further relief as the Court deems equitable and just.

Dated: May 13, 2024                     Respectfully submitted.

                                        MICHAEL T. HILGERS
                                        Attorney General of Nebraska

                                        /s/ Eric J. Hamilton
                                        ERIC J. HAMILTON (CA 296283)
                                        *Solicitor General*
                                        ZACHARY B. POHLMAN*
                                        *Assistant Solicitor General*
                                        Nebraska Department of Justice
                                        2115 State Capitol
                                        Lincoln, Nebraska 68509
                                        Tel.: (402) 471-2683
                                        Fax: (402) 471-3297
                                        eric.hamilton@nebraska.gov
                                        zachary.pohlman@nebraska.gov

                                        *Counsel for Plaintiff State of Nebraska*

                                        Additional counsel listed on next page

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Steve Marshall
Attorney General of Alabama

/s/ Robert M. Overing
Robert M. Overing*
*Deputy Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Tel.: (334) 242-7300
Fax: (334) 353-8400
robert.overing@alabamaag.gov

*Counsel for Plaintiff State of Alabama*

Tim Griffin
Attorney General of Arkansas

Nicholas J. Bronni
*Solicitor General*
/s/ Dylan L. Jacobs
Dylan L. Jacobs*
*Deputy Solicitor General*
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Tel.: (501) 682-2007
dylan.jacobs@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

Arizona State Legislature

Warren Petersen
President of the Arizona State Senate

Ben Toma
Speaker of the Arizona House of Representatives

/s/ Justin D. Smith
Justin D. Smith*
James Otis Law Group, LLC
13321 North Outer Forty Road, Suite 300
St. Louis, Missouri 63017
Tel.: (816) 678-2103
justin.smith@james-otis.com

*Counsel for Plaintiff Arizona State Legislature*

Christopher M. Carr
Attorney General of Georgia

/s/ Stephen J. Petrany
Stephen J. Petrany*
*Solicitor General*
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
Tel.: (404) 458-3408
spetrany@law.ga.gov

*Counsel for Plaintiff State of Georgia*

RAÚL R. LABRADOR
Attorney General of Idaho

/s/ Joshua N. Turner
JOSHUA N. TURNER*
*Chief of Constitutional Litigation and Policy*
ALAN M. HURST*
*Solicitor General*
Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720
Tel.: (208) 334-2400
josh.turner@ag.idaho.gov
alan.hurst@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

THEODORE E. ROKITA
Attorney General of Indiana

/s/ James A. Barta
JAMES A. BARTA*
*Solicitor General*
Indiana Attorney General's Office
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, Indiana 46204
Tel.: (317) 232-0709
james.barta@atg.in.gov

*Counsel for Plaintiff State of Indiana*

BRENNA BIRD
Attorney General of Iowa

/s/ Eric H. Wessan
ERIC H. WESSAN*
*Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
Tel.: (515) 823-9117
Fax: (515) 281-4209
eric.wessan@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

KRIS W. KOBACH
Attorney General of Kansas

/s/ Abhishek S. Kambli
ABHISHEK S. KAMBLI*
*Deputy Attorney General*
Office of the Kansas Attorney General
Memorial Building, 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612-1597
Tel.: (785) 296-7109
Fax: (785) 291-3767
abhishek.kambli@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

ELIZABETH B. MURRILL
Attorney General of Louisiana

/s/ J. Benjamin Aguiñaga
J. BENJAMIN AGUIÑAGA*
*Solicitor General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70802
Tel.: (225) 506-3746
aguinagab@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

ANDREW BAILEY
Attorney General of Missouri

/s/ Caleb Rutledge
CALEB RUTLEDGE*
*Assistant Attorney General*
Attorney General's Office of Missouri
Post Office Box 899
Jefferson City, Missouri 65102
Tel.: (573) 751-0812
Fax: (573) 751-0774
caleb.rutledge@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

AUSTIN KNUDSEN
Attorney General of Montana

/s/ Christian B. Corrigan
CHRISTIAN B. CORRIGAN*
*Solicitor General*
PETER M. TORSTENSEN, JR.*
*Deputy Solicitor General*
Montana Department of Justice
215 N. Sanders
Helena, Montana 59601
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*Counsel for Plaintiff State of Montana*

GENTNER DRUMMOND
Attorney General of Oklahoma

/s/ Garry M. Gaskins, II
GARRY M. GASKINS, II*
*Solicitor General*
JENNIFER L. LEWIS*
*Deputy Attorney General*
Office of the Attorney General
of Oklahoma
313 NE Twenty-First St.
Oklahoma City, Oklahoma 73105
Tel.: (405) 521-3921
garry.gaskins@oag.ok.gov
jennifer.lewis@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

1    ALAN WILSON                                 SEAN REYES
2    Attorney General of South Carolina          Attorney General of Utah

3    /s/ Joseph D. Spate                         /s/ Stanford Purser
4    JOSEPH D. SPATE*                            STANFORD PURSER*
     *Assistant Deputy Solicitor General*        *Solicitor General*
5    1000 Assembly Street                        Office of the Utah Attorney General
6    Columbia, South Carolina 29201              160 E. 300 S., 5th Floor
     Tel.: (803) 734-3371                        Salt Lake City, Utah 84111
7    josephspate@scag.gov                        Tel.: (385) 382-4334
8                                                spurser@agutah.gov

9    *Counsel for Plaintiff State of South Carolina*      *Counsel for Plaintiff State of Utah*

10
11   PATRICK MORRISEY                            BRIDGET HILL
     Attorney General of West Virginia           Attorney General of Wyoming
12
13   /s/ Michael R. Williams                     /s/ Ryan Schelhaas
14   MICHAEL R. WILLIAMS*                        RYAN SCHELHAAS*
     *Principal Deputy Solicitor General*         *Chief Deputy Attorney General*
15   Office of the Attorney General of West Virginia   Office of the Wyoming Attorney General
16   State Capitol Complex                       109 State Capitol
     Building 1, Room E-26                       Cheyenne, Wyoming 82002
17   Charleston, West Virginia 25301             Tel.: (307) 777-5786
     Tel.: (304) 558-2021                        ryan.schelhaas@wyo.gov
18   michael.r.williams@wvago.gov
19                                               *Counsel for Plaintiff State of Wyoming*
     *Counsel for Plaintiff State of West Virginia*
20
21
22
23
24
25
26
27
28

*Complaint for Declaratory Judgment and Injunctive Relief*                    Page 41

1
/s/ Nathan D. Clark
2
NATHAN D. CLARK*
JESSICA K. ROBINSON*
3
Cline Williams Wright Johnson & Oldfather
4
233 South 13 Street
Suite 1900
5
Lincoln, Nebraska 68508
6
Tel.: (402) 474-6900
nclark@clinewilliams.com
7
jrobinson@clinewilliams.com
8
9
*Counsel for Plaintiff Nebraska Trucking
Association*
10
11
*Pro hac vice application forthcoming
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Complaint for Declaratory Judgment and Injunctive Relief*                    Page 42